UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MICHAEL A. THORPE, | CASE NO. 3:24-cv-05637-DGE |
| Plaintiff, | |
| v. | ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## I    INTRODUCTION

This matter comes before the Court on Plaintiff's motion for summary judgment (Dkt. No. 25) and the Government's cross-motion for summary judgment (Dkt. No. 28).  Having reviewed the Parties' briefing and the remainder of the record in full, Plaintiff's motion for summary judgment is DENIED.  The Government's motion for summary judgment is GRANTED.

## II    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Marital Problems and 2013 Domestic Violence Conviction

Plaintiff is a former United States Marine Corps corporal who served for six years.  (Dkt. No. 1 at 3.)  He was honorably discharged in November 2013, after which he and his wife, Cassie Smith, moved to Washington State, where they currently reside.  (*Id.* at 1, 3.)  Plaintiff and Smith have known each other since they were fifteen years old and now share two young daughters.  (*Id.* at 3–4.)

The facts underlying this case are largely undisputed.  On September 23, 2013, Plaintiff was charged with two counts of battery against Smith, in violation of California Penal Code §§ 242 and 243(e)(1).  (Dkt. No. 26 at 5.)  The couple was living in San Diego, California and were having "marital problems" following Plaintiff's return from deployment in Afghanistan. (Dkt. No. 29-1 at 6–7.)

Plaintiff recalled that on September 7, 2013, he had found some "disturbing photos" of Smith with another man, upsetting him and prompting him to throw a vacuum "across the room," though the vacuum did not hit Smith.  (Dkt. Nos. 29-1 at 7-8, 10; 29-3 at 7.)  He had been drinking.  (Dkt. No. 29-1 at 8.)  Smith asked him to leave the home, and when he refused, she called the police.  (*Id.* at 7.)  Plaintiff stated he was using "foul language" and likely called Smith names.  (*Id.* at 8–9.)  He was arrested for assault that night, despite not physically contacting Smith.  (*Id.* at 10–11.)  He stated Smith told police he hit her the night of the altercation involving the vacuum because he had actually hit her a night or two before.  (*Id.* at 13.)  During that fight, they were having a similar argument when Plaintiff "slapped [Smith] across the face." (*Id.* at 14.)  He says they were face-to-face, and his reaction was "automatic" and he "just did it without even really thinking," but "it wasn't like, [I] didn't throw her across the room.  I didn't

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 2

even leave a mark on her face." (*Id.*) He stated he "shocked himself." (*Id.*) Plaintiff spent a night in jail following his arrest. (*Id.* at 15.)

After the incident, Smith called her mother crying; she was "emotional" and "wish[ed] [she] wasn't in California." (Dkt. No. 29-2 at 15–16.) She recalled things were "difficult" because the couple had been fighting "a lot." (*Id.* at 16.) Smith's mother flew to San Diego to help her pack, but Smith ended up staying in the couple's home. (*Id.*)

About a week after he was arrested but before he was charged, Plaintiff and Smith had another volatile argument. (Dkt. No. 29-1 at 19.) Plaintiff was on his way home when he received a call from his gunnery sergeant telling Plaintiff he was going to be confined to base because Smith had told the sergeant she feared for her physical safety. (*Id.* at 23–24.) The sergeant was aware of the situation because Plaintiff informed him "as soon as [he] was arrested," because "[t]hat's what you're supposed to do in the military." (*Id.* at 24.) The sergeant apparently urged Plaintiff not to go home, but Plaintiff convinced the sergeant to let him get his uniform and belongings. (*Id.*) When he got home, the couple argued again, and "out of anger," Plaintiff picked up a long, serrated knife from the kitchen sink and cut his wrist, telling Smith, "'[t]his is what you're doing to me.'" (*Id.* at 20–21.) He recalls that after cutting himself he "realized [he] was being stupid[]" and "patched himself up[]" with his combat first aid kit. (*Id.* at 20.) Ultimately, the cut on Plaintiff's wrist required 32 stiches. (*Id.* at 22.)

Following this incident, Smith reported to Plaintiff's gunnery sergeant that he could be violent and suicidal; she testified that during this timeframe Plaintiff had cut his wrist three times. (Dkt. Nos. 29-1 at 18–19; 29-2 at 17.) Plaintiff was confined to base for a week and a non-commissioned officer would check on him "every so many hours." (Dkt. No. 29-1 at 18.) The court placed a restraining order on Plaintiff, which was in place for about a month. (*Id.* at

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 3

16.) During this time, Plaintiff and Smith did not see each other; he stayed on base and Smith stayed in the couple's home. (*Id.* at 17.) Plaintiff stated there was "a lot of stuff going on" at that time and that he was struggling after recently returning from Afghanistan, though he did not attribute his struggles to his time overseas. (*Id.* at 17–18.) He recalled feeling "betrayed by [his] friend, and also [his] wife," and experienced "feelings of hurt and anger." (*Id.* at 18.) He "felt like [he] had let [himself] down too." (*Id.*)

In November 2013, Plaintiff was released from active duty. (Dkt. No. 26 at 10.) In December, he pled guilty to one count of battery pursuant to California Penal Code § 242 for "unlawfully us[ing] force upon Cassie Smith." (*Id.* at 6–9.) Smith recalled that at the time, she was "not willing" to be a witness in the case, because "it was bad, but it wasn't bad enough" where she "wanted to press charges or anything like that." (Dkt. No. 29-2 at 18.) Plaintiff's sentence included a ten-year firearm restriction in California, "bench parole," and a requirement that he take a yearlong domestic violence and anger management program, which he completed in April 2015. (Dkt. No. 26 at 11; 29-1 at 12 29-3 at 6.)

## B. Subsequent Domestic Strife

On May 18, 2014, after the couple relocated to Longview, Washington, Plaintiff was arrested again. (Dkt. No. 29-1 at 26.) He stated he and Smith were arguing again about "the same things[,]" and he was "trapped like in a small apartment, being yelled at, and so out of frustration," he picked up a hammer from the table and hit a picture hanging on the wall. (*Id.* at 26–27.) He stated he did not threaten Smith with the hammer, nor did he wave it around. (*Id.* at 28.) Smith recalled that it was a "scenery" picture her aunt gave her, and it was one she "really liked." (Dkt. No. 29-2 at 14.) Plaintiff stated Smith was not in the room when he smashed the picture with the hammer; Smith thought she was. (Dkt. Nos. 29-1 at 28; 29-2 at 14.) After

breaking the picture, Plaintiff packed a bag and after he left, Smith called the police. (Dkt. No. 29-1 at 26–27.) Officers surrounded Plaintiff's car, told him to put his hands on the steering wheel, and arrested Plaintiff. (*Id.* at 27.) He lived with a relative for "a couple of months" following his arrest "to figure things out." (Dkt. No. 29-3 at 7.) Ultimately Plaintiff was charged with a violation of Washington Revised Code § 9A.48.090 (malicious mischief in the third degree). (*Id.*) The charges were dismissed in June 2016 after Plaintiff completed a two-year stipulated order of continuance. (*Id.*)

As of the time of his deposition in April 2025, Plaintiff testified the only times he had ever been arrested were September 2013 and May 2014.[1] (Dkt. No. 29-1 at 30.) In April 2023, Plaintiff's conviction was dismissed under California Penal Code § 1203.4. (Dkt. No. 26 at 12–13.)

### C. Gun Ownership and Intended Use

Plaintiff and Smith live with their two daughters "out in the country in the middle of nowhere." (Dkt. No. 29-1 at 33.) Plaintiff intends to purchase "a couple" firearms: likely a hunting rifle and a self-defense handgun. (*Id.* at 31.) Plaintiff currently bow hunts with Smith's brother; he hunts elk and deer but gets a bear tag "just in case." (*Id.* at 6, 32.) Plaintiff is interested in having a handgun for self-defense because of his work on the railroad in "pretty crime ridden places[,]" and so he could defend himself and his family at their home from both intruders and large predators. (*Id.* at 32–33; Dkt. No. 29-3 at 5.) He speculated that he "might"

---

[1] At some point in 2014, prior to the altercation involving the hammer and Smith's scenery picture, Plaintiff apparently broke a piece of furniture in the couple's bedroom during another argument; the police were called and spoke with both Plaintiff and Smith but no arrest was made. (Dkt. No. 29-1 at 30.)

collect antique weapons, but did not anticipate another purpose for which he would purchase a gun.  (Dkt. No. 29-1 at 31.)

Smith owns several of her own guns for both hunting and self-defense.  (Dkt. No. 29-3 at 4.)  She stores all but one at her brother's home; she keeps a Remington Hellcat in a safe at her and Plaintiff's house.  (Dkt. No. 29-2 at 10–11.)  She testified that Plaintiff does not have the code to the safe and that she takes steps to ensure Plaintiff cannot access her firearms.  (*Id.* at 11, 13.)  She wants Plaintiff to be able to teach his daughter "how to shoot and hunt."  (*Id.* at 19.)  She stated in her deposition that if Plaintiff had access to firearms, she would feel safe, and she would feel that her children and the public would also be safe.  (*Id.*)

The record is unclear when Plaintiff initially applied for a firearm license, but on December 19, 2023, Plaintiff's appeal to the Washington State Patrol Firearms Background Division ("FBD") concerning his firearm background check was denied.  (Dkt. No. 26 at 14.)  The FBD cited to 18 U.S.C. § 922(g)(9) in support of Plaintiff's denial.  (*Id.*)

**D.  Federal Lawsuit**

Plaintiff filed suit on August 5, 2024, alleging just one cause of action against the Government for violating Plaintiff's constitutional rights "by denying him the ability to keep, bear, and purchase firearms as guaranteed to him by the Second Amendment."  (Dkt. No. 1 at 4.)  Plaintiff alleges as a "direct and proximate result," he has "suffered and continues to suffer from an unlawful deprivation of his fundamental constitutional right to keep and bear arms."  (*Id.*)  Plaintiff seeks declaratory relief that 18 U.S.C. § 922(g)(9), as applied to him, violates his "right to keep and bear arms as secured by the Second Amendment," as well as a permanent injunction prohibiting the Government from enforcing § 922(g)(9) against him.  (*Id.* at 5.)

### III    STANDING

On November 12, 2025, while the cross-motions were pending, the Court held a status conference and raised the issue of whether Plaintiff had sufficiently established Article III standing to bring this lawsuit.  (Dkt. No. 34.)  It directed the Parties to submit supplemental briefing on the issue; Plaintiff filed his supplemental brief on December 3, and the Government filed its brief on December 15.  (Dkt. Nos. 39, 40.)  Plaintiff asserted he has pre-enforcement standing to bring this lawsuit (Dkt. No. 39 at 2–4) and the Government concurred (Dkt. No. 40 at 1).  Because federal courts have an independent obligation to determine whether standing exists, even if the parties do not challenge it, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009), the Court will first analyze the issue of Article III standing before turning to the merits of the cross motions.

To establish Article III standing, a plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical."  *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1270 (9th Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted and cleaned up)).  The injury must be "'fairly traceable to the challenged action of the defendant[.]'" *Lujan*, 504 U.S. at 560 (citation omitted and cleaned up).  To establish the redressability prong, the plaintiff must show it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561 (citation and internal quotation marks omitted).  Though the plaintiff's burden to establish redressability is "relatively modest," *see Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (citation omitted), the plaintiff must show a "'substantial likelihood that the relief sought would redress the injury.'"  *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (citation omitted).

**A.  Pre-Enforcement Standing**

There is a separate standing framework that applies to situations in which the injury is "predicated on the anticipated enforcement of the challenged statute in the future and the resulting chilling effect in the present." *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024).  The pre-enforcement inquiry "hinges on whether a party has 'alleged a sufficiently imminent injury for the purposes of Article III.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 151 (2014)).[2]  In *Driehaus*, the Supreme Court presented three "benchmarks" to determine whether there is a "credible threat of enforcement": "(1) a plaintiff must allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) a plaintiff's intended future conduct must be 'arguably . . . proscribed by [the] statute' it wishes to challenge, and (3) the threat of future enforcement must be 'substantial.'" *Seattle Pac.*, 104 F.4th at 59 (quoting *Driehaus*, 573 U.S. at 161–162 (internal citation omitted)).

Under the first prong, a plaintiff must show they have "'an intention to engage in a course of conduct arguably affected with a constitutional interest.'" *Driehaus*, 573 U.S. at 161 (citation omitted).  If the plaintiff has already engaged in conduct that would violate the challenged law, courts have "relaxed the requisite level of detail[]" required in the pleadings.  *Seattle Pac.*, 104 F.4th at 59.

Here, Plaintiff has put forth sufficient intention to purchase a firearm, which he is currently not permitted to do under 18 U.S.C. § 922(g)(9).  (*See* Dkt. No. 1 at 4) (challenging his "lifetime firearm prohibition under" the statute).  Indeed, Plaintiff has already attempted to

---

[2] The Ninth Circuit explicitly adopted the *Driehaus* framework for analyzing pre-enforcement standing in *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (internal citations and quotations omitted) ("Though our circuit has toggled between the [two different] formulations, we have adopt[ed] the Supreme Court's framework in *Driehaus*.").

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 8

purchase a firearm in Washington and appealed the denial of his permit to the FBD, which affirmed the denial and cited to § 922(g)(9) in support of its decision.  (Dkt. No. 26 at 14.)  Plaintiff's alleged intent to engage in particular conduct that "intersects" with his claimed Second Amendment interest fulfills the first requirement of the *Driehaus* inquiry.  *Seattle Pac.*, 50 F.4th at 60.

Second, a plaintiff must show that their intended future conduct is proscribed by the challenged statute.  *Driehaus*, 573 U.S. at 162.  The Court has no difficulty here concluding that Plaintiff's conduct is "arguably proscribed" by § 922(g)(9).  *Seattle Pac.*, 50 F.4th at 60.  The statute clearly states that it is unlawful for someone "who has been convicted in any court of a misdemeanor crime of domestic violence[]" to "possess . . . any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  § 922(g)(9).  Plaintiff falls within the prohibition because he was convicted of a domestic violence misdemeanor.  (Dkt. No. 26 at 6–9.)  And as discussed, Plaintiff has clearly identified—and acted upon—his intention to purchase a firearm.  (*See* Dkt. Nos. 26 at 14 (FBD letter affirming denial of background check); 29-1 at 31–34 (Plaintiff explaining his desire to purchase a hunting rifle and a handgun for self-defense); 29-2 at 19 (Smith explaining she would like Plaintiff to be able to teach their daughters to shoot).)  But because of his 2013 misdemeanor conviction (Dkt. No. 26 at 6–9), Plaintiff is prohibited from doing so.[3]  Therefore, the second *Driehaus* factor has been met.

---

[3] Plaintiff further alleges that the "escape clause" found in 18 U.S.C. § 921(a)(33) does not apply to him because the dismissal of his misdemeanor does not qualify as a conviction that "has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored[.]" (Dkt. No. 1 at 3); § 921(a)(33)(B)(ii).  The Court will analyze that argument more thoroughly in its consideration of the merits of the Parties' cross-motions and concludes that for purposes of pre-enforcement standing, Plaintiff has established that his future conduct is disallowed by federal firearm law. *See* § 922(g)(9).

Finally, a plaintiff must demonstrate a "substantial threat of enforcement." *Seattle Pac.*, 104 F.4th at 60. This factor is "often linked to the enforcing authority's willingness to disavow enforcement." *Id.*

Here, the Court is unaware whether the government has specifically threatened to enforce § 922(g)(9) against Plaintiff. However, the government's silence on the issue, and its consistent position that the statute is not unconstitutional as applied to Plaintiff (*see* Dkt. No. 28 at 18–20; 40 at 1; 45), at least indicates the government has not ruled out enforcement. Further, past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Driehaus*, 573 U.S. at 164 (citation omitted). In this situation, there is ample evidence of the government's prior enforcement of § 922(g)(9) against individuals with domestic violence convictions. *See, e.g.*, *United States v. Jordan*, 804 F. Supp. 3d 1100 (D. Idaho 2025) (defendant moving to dismiss an indictment for violation of § 922(g)(9)); *United States v. Padgett*, Case No. 3:21-cr-00107-TMB-KFR, 2023 WL 3483929 (D. Alaska Jan. 4, 2023) (same). Plaintiff argues in his supplemental brief that the threat of prosecution is "real and credible," because he is faced with a potential prison sentence of up to 15 years if he were prosecuted under § 922(g)(9). (Dkt. No. 39 at 3) (discussing nationwide statistics for § 922(g) convictions in 2024). Therefore, Plaintiff has good reason to believe that § 922(g)(9) would be enforced against him too, should he choose to illegally obtain a firearm, and he is not required to first violate the law in order to have his claim adjudicated. *See MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128–129 (2007) ("[W]here threatened action by *government* is concerned, [courts] do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced.").

Consideration of a "substantial threat of enforcement" thus weighs in favor of finding standing under the *Driehaus* factors. *Seattle Pac.*, 104 F.4th at 60.

### B. Redressability

For an injury to be redressable under the Article III standing framework, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted). In matters in which the plaintiff is the object of the action at issue, there is "ordinarily little question" that the government's action or inaction caused the injury, and that a judgment preventing or requiring the action will redress it. *Id.* at 561–562. In *Seattle Pacific*, the Ninth Circuit acknowledged that there may be some ambiguity "[a]t the edges" as to which declaratory judgment actions are justiciable under Article III, but affirmed that in cases such as this, when the government is threatening a particular action, there is a "wealth of precedent supporting the redressability of pre-enforcement injuries with declaratory relief." 104 F.4th at 62; *see also Steffel v. Thompson*, 415 U.S. 452, 480 (1974) (Rehnquist, J., concurring) ("[T]he declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity.").

In this case, Plaintiff seeks a declaratory judgment that § 922(g)(9) is unconstitutional as applied to him and a permanent injunction preventing the government from enforcing § 922(g)(9) against him. (Dkt. No. 1 at 5.) This request fits within the line of pre-enforcement standing cases discussed in *Seattle Pacific*. *See* 104 F.4th at 62 (collecting cases). Notwithstanding, in ordering supplemental briefing, the Court was concerned about whether Plaintiff had standing, as it was clear from the evidence in the record that Plaintiff applied for— and was denied—a firearm permit in Washington *before* he filed this lawsuit. (*Compare* Dkt. No. 26 at 14 (FPB's denial of firearm background check on December 19, 2023) *with* Dkt. No. 1

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 11

at 5 (complaint filed August 5, 2024).)  Plaintiff has now clarified he is taking the position that he fears *future* prosecution by the federal government, which was not immediately clear from the face of the complaint.  (Dkt. No. 39; *see generally* Dkt. No. 1.)  The Court remains perplexed as to why Plaintiff did not name the state of Washington as a defendant in his complaint, as it appears his ultimate goal is to obtain a legal firearm permit in Washington.  Nevertheless, it concludes that Plaintiff has established standing on the narrow question of the constitutionality of § 922(g)(9) as applied to him, premised on pre-enforcement standing as articulated in *Driehaus*.  573 U.S. at 161–162 (citation omitted).  The Court notes this ruling does not impact or direct the state of Washington's actions or its discretion to issue a firearm permit to Plaintiff, because Washington is not a party to this lawsuit.

## C.  Prudential Ripeness

Though the Court did not raise the issue of prudential ripeness alongside its questions about Article III standing, it briefly addresses it.[4]  Courts must assess "'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (citation omitted).  "'A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'" *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999) (citation omitted).  "'To meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship.'" *Id.* (citation omitted).  In evaluating hardship, courts "consider whether the 'regulation requires an immediate and

[4] Because constitutional ripeness "coincides squarely" with the injury-in-fact prong in the context of pre-enforcement standing, the Ninth Circuit considers the two concepts together. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). Here, Plaintiff has alleged an injury in fact and has therefore established constitutional standing. *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1154 (9th Cir. 2017).

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 12

significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (citing *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 783 (9th Cir. 2000) (internal quotation marks omitted)).

Here, Plaintiff raises issues that are primarily legal, do not require additional factual development, and the challenged action is final. *US W. Commc'ns*, 193 F.3d at 1118. Plaintiff must also show that withholding review would result in direct, immediate hardship. *Id.* Plaintiff argues he is enduring an ongoing harm: "[He] has suffered and continues to suffer from an unlawful deprivation of his fundamental constitutional right to keep and bear arms." (Dkt. No. 1 at 4.) Constitutional injuries "inflict serious damage" and the "public interest is served through enjoinment of an unconstitutional application of law." *Menges v. Knudsen*, 538 F. Supp. 3d 1082, 1120–1121 (D. Mont. 2021) (citation omitted) (discussing constitutional injury in the context of permanent injunctive relief). Here, Plaintiff deserves to know whether his constitutional rights are being continually and unlawfully burdened; his current firearm ban is not hypothetical, nor is it contingent upon future events that may not occur. *See US W. Commc'ns*, 193 F.3d at 1118; *Selecky*, 586 F.3d at 1126; *Ass'n of Am. Med. Colls.*, 217 F.3d at 782 (9th Cir. 2000) (citation omitted). Because Plaintiff mounts a "*present* challenge to his lifetime firearm prohibition" (Dkt. No. 1 at 4) (emphasis added), his claims are ripe for review.

## IV   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—in most civil cases, a preponderance of the evidence. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv. Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 14

## V    DISCUSSION

### A.  The Parties' Arguments

This case presents a purely legal issue: whether 18 U.S.C. § 922(g)(9), which makes it unlawful for someone "who has been convicted in any court of a misdemeanor crime of domestic violence[]" to possess a firearm, is unconstitutional as applied to Plaintiff.  The Parties largely agree that the framework set forth in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and fleshed out in *United States v. Rahimi*, 602 U.S. 680 (2024) guides the analysis, but dispute how that framework should be applied in Plaintiff's case.  In his motion for summary judgment, Plaintiff argues that *Rahimi* left open the question of whether permanent (rather than temporary) disarmament under § 922(g)(9) was constitutional and posits that in this situation it is not, because there is no historical analogue for permanent disarmament of someone convicted of spousal abuse.  (Dkt. No. 25 at 4–8.)  In its cross-motion, the Government argues § 922(g)(9) "fits comfortably" within the history and tradition of categorically disarming those the legislature has deemed dangerous, and that Plaintiff's domestic violence misdemeanor conviction is no different.  (Dkt. No. 28 at 14–18.)

### B.  18 U.S.C. § 922(g)(9)

§ 922(g)(9) provides that it shall be unlawful for any person "who has been convicted in any court of a misdemeanor crime of domestic violence[]" to "possess . . . any firearm or ammunition."  A "misdemeanor crime of domestic violence" is defined as (1) "a misdemeanor under Federal, State, Tribal, or local law"; and (2)

> has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, by a person similarly situated to a spouse, parent, or

guardian of the victim, or by a person who has a current or recent former dating relationship with the victim."

*Id.* § 921(a)(33)(A)(i), (ii).  The Parties do not dispute that Plaintiff's 2013 misdemeanor conviction in San Diego meets these criteria.  (*See* Dkt. No. 26 at 6–9.)

### C.  Second Amendment Framework Under *Bruen*

The Supreme Court has announced the right to keep and bear arms is "among the foundational rights necessary to our system of Government[,]" *McDonald v. City of Chi., Ill.*, 561 U.S. 742, 777 (2010) but has cautioned that the right is not "unlimited."  *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  The Court presented the framework for analyzing Second Amendment challenges in *Bruen*.  *See* 597 U.S. 1.  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id.* at 24. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.*  Only if a court makes that finding may it conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Id.* (citation omitted).  In *Rahimi*, the Court clarified that *Bruen*'s second step does not require "stringent adherence to Founding-era laws, emphasizing that its 'precedents were not meant to suggest a law trapped in amber.'"  *Wolford v. Lopez*, 116 F.4th 959, 978 (9th Cir. 2024) (quoting *Rahimi*, 602 U.S. at 691).  Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."  *Rahimi*, 602 U.S. at 692.  A court's job is to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'"  *Id.* (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry."  *Rahimi*, 602 U.S. at 692.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 16

The distinction between a facial and an as-applied challenge to a statute "goes to the breadth of the remedy employed by the Court[.]" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). The substantive rule of law necessary to prove the constitutional violation remains the same. *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (citation omitted) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications. So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation."). A statute is unconstitutional as applied when, "by its own terms, [it] infringe[s] constitutional freedoms in the circumstances of the particular case." *United States v. Christian Echoes Nat'l Ministry, Inc.*, 404 U.S. 561, 565 (1972).

**D. Analysis**

Plaintiff argues § 922(g)(9), as applied to the facts of his case, violates his Second Amendment rights. (Dkt. No. 1 at 4.) The Parties do not address step one of the *Bruen* analysis, but upon review, the Court concludes that because "the prohibition in § 922(g)(9) unquestionably implicates [Plaintiff]'s rights under [the] plain text of the Second Amendment, his proposed course of conduct is presumptively protected and the government 'bears the burden to justify its regulation' as consistent with 'our historical tradition of firearm regulation . . . .'" *White v. United States*, Case No. 5:23-cv-02215-DSF-SP, 2024 WL 4868287, at *2 (C.D. Cal. Sept. 24, 2024) (quoting *Rahimi*, 602 U.S. at 691) (internal citation omitted); *see also United States v. Martinez*, --- F.4th ----, 2026 WL 760056, at *3 (9th Cir. Mar. 18, 2026) ("Appellants' status as domestic violence misdemeanants does not remove them from the ambit of the Second Amendment's text.").

### 1. The public safety purpose of § 922(g)(9) is consistent with the nation's historical tradition of firearm regulation.

The next step in the inquiry is whether § 922(g)(9), as applied to Plaintiff, is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The Court briefly digresses to discuss the relevant legal landscape.

In *Rahimi*, the Court upheld the constitutionality of § 922(g)(8) in the context of an individual indicted on one count of possessing a firearm while subject to a domestic restraining order. 602 U.S. at 688. The Court held: "When a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect." *Id.* at 690. In reaching this conclusion, the Court focused on traditional surety laws, which "could be [preemptively] invoked to prevent all forms of violence, including spousal abuse[,]" and which targeted the "misuse of firearms." *Id.* at 695–696. The Court also pointed to "going armed" laws, which prevented "'riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land.'" *Id.* at 697 (citation omitted). Together, these historical analogues, though while no means identical to the legislative scheme in § 922(g)(8), confirmed that prohibiting those "found by a court to present a threat to others" fits "neatly" within traditional firearm regulation. *Id.* at 698. Importantly, the Court focused on the "limited duration" of both the surety bonds and § 922(g)(8), which prohibits firearm possession "so long as the defendant '*is*' subject to a restraining order." *Id.* at 699 (citing § 922(g)(8)) (emphasis added). The Court left open the question of whether the statute may be unconstitutional in other circumstances, such as one where the government disarms someone "permanently." *Id.* at 713 (Gorsuch, J., concurring).

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 18

Applying *Bruen* and *Rahimi*, the Ninth Circuit in *United States v. Duarte* upheld the constitutionality of § 922(g)(1), which prohibits those who have been convicted of a felony from possession of firearms, even if it is a nonviolent felony. 137 F.4th 743, 755–762 (9th Cir. 2025). The court's investigation into historical tradition "reveal[ed] that legislatures were permitted to categorically disarm those they deemed dangerous without having to perform 'an individualized determination of dangerousness as to each person in a class of prohibited persons.'" *Id.* at 760. (citation omitted). Further, § 922(g)(1) fit within that historical tradition, because it reflected the same legislative judgment that firearms must be kept away from "those who commit the most serious crimes" in order to protect the public. *Id.* at 761.

During the pendency of this matter, the Ninth Circuit issued its decision for publication in *United States v. Martinez*.[5] Joining the other circuits that have considered the constitutionality of § 922(g)(9), the court held that the statute is facially constitutional and was constitutional as applied to the individual defendants. 2026 WL 760056, at *3. *See also United States v. Simmons*, 150 F.4th 126 (2d Cir. 2025); *United States v. Jackson*, 138 F.4th 1244 (10th Cir. 2025); *United States v. Nutter*, 137 F.4th 224 (4th Cir. 2025), *cert. denied*, --- U.S ----, 146 S. Ct. 270 (2025); *United States v. Bernard*, 136 F.4th 762 (8th Cir. 2025), *cert. denied*, --- U.S. ----, 146 S. Ct. 254 (2025); *United States v. Gailes*, 118 F.4th 822 (6th Cir. 2024). In *Martinez*, the court looked to the "'how' and 'why'" of the burden imposed by § 922(g)(9) and noted that the historical principles underpinning § 922(g)(8) in *Rahimi* applied equally in the context of domestic violence misdemeanors. 2026 WL 760056, at *4. Surety laws operated as a form of

---

[5] The Government provided a copy of the opinion in a notice of supplemental authority filed on March 18, 2026. (*See* Dkt. No. 42.) The Court issued an order to show cause, requiring both parties to submit briefing "regarding the impact of *United States v. Martinez* on the present matter." (Dkt. No. 43 at 2.)

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 19

"'preventive justice'" and were invoked to prevent violence of all kinds, specifically targeting firearm misuse. *Id.* (citing *Rahimi*, 602 U.S. at 695–696). Going armed laws "'punish[ed] those who had menaced others with firearms' with 'forfeiture of the arms[.]'" *Id.* (citing *Rahimi*, 602 U.S. at 697). Similarly, § 922(g)(9) "targets people deemed dangerous to the physical safety of others." *Id. Duarte*'s discussion of categorical firearm bans for those the legislature considers dangerous, "'without an individualized determination of dangerousness[,]'" "reinforced" the Ninth Circuit's opinion. *Id.* at *5 (citing *Duarte*, 137 F.4th at 748, 761). The court noted § 922(g)(9) was intended to fill a "dangerous gap in gun control laws[,]" because "[d]omestic violence rarely results in a felony conviction" and because even misdemeanors are challenging to pursue. *Id.* at *6. Further, recidivism rates for domestic violence are high. *Id.* (citing various studies and articles). These findings supported the court's conclusion that the categorical disarmament of felons under § 922(g)(1) upheld in *Duarte* "applies equally" to § 922(g)(9). *Id.* at *5.

The Ninth Circuit and other courts that have analyzed § 922(g)(9) point to the temporary nature of its restrictions in support of the statute's constitutionality. *See Martinez*, 2026 WL 760056, at *5 ("[I]n at least some cases § 922(g)(9), like § 922(g)(8), operates as only a temporary ban on firearm possession."); *Jackson*, 138 F.4th at 1254 ("Given the various ways by which his Second Amendment right may be restored, [the defendant]'s penalty was conditional, and not necessarily permanent. . . . His conditional disarmament is clearly a 'lesser restriction' than a permanent ban, the constitutionality of which was upheld by this court post-*Rahimi*."); *Gailes*, 118 F.4th at 829 (citations omitted) ("the purported permanent ban in § 922(g)(9) may not always be so, given that domestic-violence misdemeanants 'can (1) petition to set aside their conviction; (2) seek a pardon; (3) have their conviction expunged; or (4) have their civil rights

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 20

fully restored.'"); *Jordan*, 804 F. Supp. 3d at 1107 (citations omitted) (dismissing the defendant's argument that § 922(g)(9) imposes a lifelong firearm ban because it "ignores § 921(a)(33),[6] which provides that a domestic violence misdemeanant is 'not disqualified' from possessing a firearm 'if 5 years have elapsed from the later of the judgment of conviction or the completion of the person's custodial or supervisor sentence[,]'" as well as ignoring the "other means by which a misdemeanant can avoid disarmament.").

### 2. The manner in which § 922(g)(9) burdens Plaintiff's Second Amendment Right is consistent with the nation's historical tradition of firearm regulation.

The Parties appear to agree that disarming someone with a domestic violence conviction, under some circumstances, is constitutionally permissible.  (Dkt. Nos. 25 at 6–7; 32 at 3–4, 6–7.) Plaintiff acknowledges that a challenge to a temporary ban on his access to firearms would "truly be foreclosed by the Supreme Court[,]" but points out that his circumstance, in which he is effectively permanently banned from gun ownership, is inconsistent with the holding in *Rahimi*. (Dkt. No. 25 at 6–8.)  He took no position on the application of *Martinez* to his case (Dkt. No. 44), which, arguably, might be viewed as a concession that *Martinez* forecloses the relief Plaintiff seeks.

In its cross-motion, the Government applies *Duarte* and argues Plaintiff's domestic violence conviction is "sufficient evidence" that he is dangerous and that his challenge should be dismissed on that basis alone.  (Dkt. No. 28 at 15.)  It cautions against creating a "regime of individualized as-applied challenges to § 922(g)(9)," which would both be "unworkable" and

---

[6] The relief afforded by § 921(a)(33)(C) is not available to Plaintiff because it only applies to those convicted of domestic violence misdemeanor against "an individual in a dating relationship"; restoration is explicitly not available "for a current or former spouse . . . of the victim."

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 21

would treat the right to bear arms differently than other rights that are forfeited upon a criminal conviction. (*Id.* at 19.)  In its response to the Court's show cause order, the Government reiterated that § 922(g)(9) "is not susceptible to as-applied challenges[]" and that the Ninth Circuit's decision in *Martinez* renders Plaintiff's lawsuit "foreclosed."  (Dkt. No. 45 at 2.)

The Court concludes the Government has demonstrated that a categorical firearm ban for individuals convicted of a domestic violence misdemeanor is consistent with the nation's historical tradition of firearm regulation, and therefore, § 922(g)(9) is constitutional as applied to Plaintiff.  Citing favorably to the categorical ban upheld in *Duarte*, *Martinez* held there is no need to "engage in a misdemeanor-by-misdemeanor inquiry under § 922(g)(9)."  2026 WL 760056, at *7.  This is because history has conclusively established that the government is empowered to "'regulate guns through categorical restrictions.'"  *Id.* (quoting *Duarte*, 137 F.4th at 761 (internal citations omitted)).  And such categorical restrictions were allowed despite sweeping non-violent and non-dangerous persons into that category.  *Id*. at *5.  "'Indeed, every categorical disarmament law was overbroad—sweeping in law-abiding people who were not dangerous, violent, untrustworthy, or unstable—yet [the laws] comported with the Second Amendment.'"  *Id*. (quoting *Duarte*, 137 F. 4th at 761).  Through enacting § 922(g)(9), Congress has determined that members of a class of individuals convicted of domestic violence misdemeanors are dangerous, and there is no need to "distinguish[] between the nature of the offense underlying particular convictions."  *Id.* at *7.  Here, because Plaintiff was definitively convicted of a domestic violence misdemeanor (*see* Dkt. No. 26 at 6–9), he falls within this class, and § 922(g)(9) is constitutional as applied to him.

Plaintiff correctly points out that his misdemeanor conviction is in practical effect permanent, because the dismissal of his conviction under California Penal Code § 1203.4 does

not satisfy the "expungement" provision of § 921(a)(33)(B)(ii).[7] (Dkt. No. 1 at 3.) This conclusion was explicitly discussed and upheld in *Jennings v. Mukasey*, 511 F.3d 894, 898–899 (9th Cir. 2007) (citation omitted) ("Section 1203.4 does not, properly speaking, 'expunge' the prior conviction. The statute does not purport to render the conviction a legal nullity. Instead, it provides that, except as elsewhere stated, the defendant is 'released from all penalties and disabilities resulting from the offense.'"). And yet, because of the dismissal and the passage of ten years since Plaintiff's misdemeanor conviction, California no longer prohibits him from possessing a firearm. Cal. Penal Code § 29805 (any person who has been convicted of a misdemeanor pursuant to, among other provisions, § 242, "is guilty of a public offense" if within 10 years of their conviction, they "own[], purchase[], receive[], or ha[ve] in possession or under custody or control, any firearm[.]"); *see also Fortson v. L.A. City Att'y's Off.*, 852 F.3d 1190, 1192 (9th Cir. 2017) ("Under California law, a conviction for Cal. Penal Code § 243 triggered Cal. Penal Code § 12021(c)(1),[8] which makes it a misdemeanor to own, purchase, receive, or have in one's custody or control any firearm for a period of ten years."); *In re J.C.*, 341 Cal. Rptr. 3d 517, 524 (Cal. Ct. App. 2026) (discussing § 12021(c)(1) and "its list of enumerated misdemeanor offenses that would trigger a 10-year firearm ban[]"); *Brown v. Ill. State Police*, 190 N.E.3d 162, 171 (Ill. 2021) ("California law[] . . . automatically allows misdemeanants to possess firearms 10 years after the qualifying conviction."). Nor does the dismissal of Plaintiff's

---

[7] § 921(a)(33)(B)(ii) provides, "[a] person shall not be considered to have been convicted of such an offense for purposes of [§ 922(g)(9)] if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms."

[8] California Penal Code § 12021(c)(1) is the predecessor law to § 29805; the state made "minor changes" and changed its codification in 2010. *See Fortson*, 852 F.3d at 1192 n.1.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 23

conviction under California Penal Code § 1203.4 restore his civil rights under § 921(a)(33)(B)(ii). In fact, the Ninth Circuit has rejected the proposition that someone whose firearm rights have been restored by operation of law, i.e., because ten years have passed since their misdemeanor conviction, means their civil rights have been restored within the meaning of § 921(a)(33)(B)(ii). *Enos v. Holder*, 855 F. Supp. 2d 1088, 1097 (E.D. Cal. 2012), *aff'd,* 585 Fed. App'x 447 (9th Cir. 2014), *cert. denied*, *Enos v. Lynch*, 576 U.S. 1055 (2015).

The curious result of all this is that, effectively, the "escape valve" provisions of § 921(a)(33)(B)(ii) are nearly inaccessible to Plaintiff, even though Plaintiff would argue the record establishes he does not pose a danger that justifies a permanent firearm ban. *See Enos*, 585 Fed. App'x at 448 ("Although California law no longer prevents [Plaintiff] from legally possessing firearms, [Plaintiff is] also subject to federal law. [Plaintiff has] not satisfied any of the [§ 922(g)(9)] exceptions, and therefore, cannot legally possess firearms under federal law.").

Despite Plaintiff's arguments to the contrary, *Martinez* precludes a "misdemeanor-by-misdemeanor inquiry" and upholds the categorical firearm ban for all domestic violence misdemeanants under § 922(g)(9). 2026 WL 760056, at *7. The Court therefore concludes § 922(g)(9) is constitutional as applied to Plaintiff.[9]

---

[9] To counter Plaintiff's contention that his firearm ban is effectively permanent, the Government suggests that because the Attorney General is "in the process" of establishing a way for individuals such as Plaintiff to seek the restoration of their firearm rights under 18 U.S.C. § 925(c), Plaintiff should instead avail himself of that process rather than seeking declaratory relief. (Dkt. Nos. 28 at 20–23; 32 at 4 n.1.) The Court does not dedicate much time to this argument except to note that a yet-to-exist restoration process, even if the Government is correct that it may be available soon, has no bearing on the issues before the Court today. Without an existing process under § 925(c), the adjudication of Plaintiff's challenge to his disarmament falls to this Court.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 24

**E.  Stay Request Denied**

In response to the Court's show cause order, Plaintiff requested the Court stay its decision until the Ninth Circuit issues a mandate in *Martinez* and thereafter until the Supreme Court has had an opportunity to weigh in on the issues presented.  (Dkt. No. 44 at 1–2.) However, a Ninth Circuit's "published decision constitutes binding authority and must be followed unless and until it is overruled by a body competent to do so."  *In re Zermeno-Gomez*, 868 F.3d 1048, 1053 (9th Cir. 2017).  District courts are not "free to ignore a controlling decision" even where a mandate has not issued.  *Id*.  Accordingly, *Martinez* is controlling even without a mandate being issued, and therefore, the Court declines to stay its decision.

## VI    CONCLUSION

The Court has considered both Parties' motions for summary judgment (Dkt. Nos. 25, 28), the supplemental briefing in response to the Court's orders to show cause (Dkt. Nos. 39, 40, 44, 45), and the remainder of the record.  Plaintiff's motion for summary judgment (Dkt. No. 25) is DENIED.  The Government's cross-motion for summary judgment (Dkt. No. 28) is GRANTED.  The trial calendar is stricken, and the Clerk shall close the case and enter judgment.

Dated this 30th day of March 2026.

David G. Estudillo
United States District Judge

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 25, 28) - 25